JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

The Middle East Forum

**(b)** County of Residence of First Listed Plaintiff  Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Sidney L. Gold, Sidney L. Gold & Associates, P.C., 1835 Market Street, Suite 515, Philadelphia, PA 19103, (215) 569-1999 & Robert A. Davitch, Esquire, Sidkoff, Pincus and Green, P.C.1101 Market Street, Ste 2700, Philadelphia, PA 19107 (215) 574-0600

## DEFENDANTS

Lisa Reynolds-Barbounis

County of Residence of First Listed Defendant  Philadelphia
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
     Plaintiff

☒ 3  Federal Question
     *(U.S. Government Not a Party)*

☐ 2  U.S. Government
     Defendant

☐ 4  Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Racketeer Influenced and Corruptions Organizations Act, 18 U.S.C. Sec. 1961 et. seq.

Brief description of cause:
Defendant has committed repeated and ongoing violations of Federal RICO statute.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE
01/22/2021

SIGNATURE OF ATTORNEY OF RECORD
/s/Sidney L. Gold, Esquire

Attorney for Plaintiff

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## DESIGNATION FORM
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _The Middle East Forum: 1650 Market St., Suite 3600, Phila., PA 19103_

Address of Defendant: _Reynolds-Barbounis: 2601 Pennsylvania Avenue, Suite 1153, Phila., PA 19130_

Place of Accident, Incident or Transaction: _1650 Market St., Suite 3600, Phila., PA 19103_

---

**RELATED CASE, IF ANY:**

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes ☐  No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes ☐  No ☑

I certify that, to my knowledge, the within case  ☐ is / ☑ is not  related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _01/22/2021_    _/s/ Sidney L. Gold, Esq._    _21374_
    *Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.  Federal Question Cases:**

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☑ 11. All other Federal Question Cases
  *(Please specify):* _Other Statutory Actions / RICO_

**B.  Diversity Jurisdiction Cases:**

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _SIDNEY L. GOLD, ESQUIRE_, counsel of record *or* pro se plaintiff, do hereby certify:

- ☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

- ☐ Relief other than monetary damages is sought.

DATE: _01/22/2021_    _/s/ Sidney L. Gold, Esq._    _21374_
    *Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

*Civ. 609 (5 2018)*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| The Middle East Forum | : | CIVIL ACTION |
| | : | |
| v. | : | |
| Lisa Reynolds-Barbounis | : | |
| | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.　　　　( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
　　and Human Services denying plaintiff Social Security Benefits.　　　　( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.　( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
　　exposure to asbestos.　　　　( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
　　commonly referred to as complex and that need special or intense management by
　　the court. (See reverse side of this form for a detailed explanation of special
　　management cases.)　　　　(x )

(f) Standard Management – Cases that do not fall into any one of the other tracks.


| 01/22/2021 | /s/ Sidney L. Gold, Esq. | PLAINTIFF |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 569-1999 | (215) 569-3870 | sgold@discrimlaw.net |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THE MIDDLE EAST FORUM** | : | **CIVIL ACTION NO.** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LISA REYNOLDS-BARBOUNIS** | : | |
| | : | |
| **Defendant.** | : | **NON-JURY TRIAL** |

<u>CIVIL ACTION COMPLAINT</u>

Plaintiff, The Middle East Forum ("MEF"), by its counsel, files this Complaint

against Defendant, Lisa Reynolds-Barbounis ("Barbounis"), and avers the following:

I.   <u>INTRODUCTION</u>

    1.     This case involves violations by Barbounis of The Racketeer Influenced

and Corrupt Organizations Act ("RICO"), codified at 18 U.S.C. §1961 *et seq.*, which

have caused direct substantial economic harm and injury to MEF, her former employer.

For purposes of the RICO statute, Barbounis is a "culpable person" who has engaged in

a "pattern" of "racketeering activity" through her use and control of and/or participation in

the management and operation of MEF, an "enterprise" affecting interstate or foreign

commerce (known herein as the "Schemes").  As set forth at length herein, Barbounis

furthered and perpetuated the Schemes by committing repeated and continuing acts of

wire fraud and trade secret theft through her use of various forms of written

telecommunications, including the internet, electronic mail, texting, and social media

messaging (individually, "Wire Communication" and collectively, "Wire

Communications"). Barbounis' unlawful conduct in furtherance of the Schemes, which

occurred over a lengthy period of time when she was employed by MEF, and continued

thereafter, poses a real threat that the conduct will be repeated in the future. The Schemes have included Barbounis' intentional concealment from MEF of the theft of MEF funds by an individual with whom she was having an extramarital affair; her deliberate abandonment of her job assigned duties for MEF, with the hidden goal of benefiting and enriching herself while MEF continued to pay her salary and benefits; and her theft and unauthorized appropriation, transmittal, conveyance, delivery and/or dissemination of confidential information of MEF, including vital trade secrets.  MEF did not discover the existence or the full extent or scope of the Schemes until after Barbounis had resigned from her employment with MEF in August of 2019, when it did an investigation of Barbounis and obtained discovery in connection with other litigation involving MEF and Barbounis (the "Post-Resignation Investigation.").

## II.   **PARTIES**

2.      Barbounis is a resident and citizen of the Commonwealth of Pennsylvania, living in Philadelphia, Pennsylvania.

3.      MEF, a foreign policy think tank, is a 501(c)(3) nonprofit organization and a legal entity for purposes of RICO, with a primary place of business located at 1650 Market Street, Suite 3600, Philadelphia, PA 19103.

4.      Founded in 1994, MEF promotes American interests in the Middle East and works to protect Western values from Middle Eastern threats through academic research, media engagement, as well as government and public outreach.

2

### III.   JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §1964 and 28 U.S.C. §1331.

6.    Venue is proper is this judicial district pursuant to 18 U.S.C. §1965 and 28 U.S.C. §1391 because Barbounis is subject to personal jurisdiction in this district and she resides within this district.

### IV.   FACTUAL BACKGROUND

#### A.   Barbounis' employment with MEF

7.    On or about October 16, 2017, Barbounis began her employment with MEF as an Executive Liaison.

8.    On or about January 3, 2019, after having worked for MEF as an Executive Liaison for approximately 15 months, Barbounis was appointed by MEF to the position of Director of Communications, which she occupied until she resigned from her employment with MEF on August 7, 2019.

9.    In her positions of employment at MEF, Barbounis had fiduciary duties to MEF, including obligations of loyalty, trust and honesty.

10.    From the inception of her employment with MEF until on or about November 5, 2018, Barbounis reported to Gregg Roman ("Roman"), Director of MEF.

11.    From on or about November 5, 2018 until she resigned from her employment at MEF on August 7, 2019, Barbounis reported to Dr. Daniel Pipes ("Pipes"), President of MEF.

**B.**     **Barbounis' willful concealment of theft of MEF funds**

12.     In 2017, MEF began advocating on behalf of Stephen Christopher Yaxley-Lennon, better known by his alias, Tommy Robinson ("Robinson"), a United Kingdom (U.K.) based activist's right to free speech.

13.     In the Spring of 2018, Barbounis commenced work on MEF's behalf in support of Robinson's right to expression.

14.     Barbounis' first point of contact in the U.K. with respect to her work for Robinson was Daniel Thomas ("Thomas"), another U.K.-based activist who was a Robinson acolyte, and who was organizing a rally in the U.K. to support Robinson, who had recently been imprisoned for contempt.

15.     At the urging of and with the encouragement of Barbounis, MEF paid Thomas $32,000 (USD), with the explicit understanding that the funds were to be used exclusively to fund one free speech rally in the U.K. in June of 2018, to support Robinson ("Robinson Rally").

16.     With that understanding, on or about June 4, 2018, MEF and Thomas entered into a written contract ("Grant Agreement") that specifically delineated the method and means by which the $32,000 was to be spent for the Robinson Rally.

17.     The Grant Agreement specifically provided that the entire $32,000 was to "be used by [Thomas] solely to fund a freedom of conscience event in Westminster Council, London, United Kingdom on June 8[, 2018]" and that Thomas "shall repay to [MEF] any unused portion of the Grant; and/or any portion of the Grant not used for the purposes described in [the Grant]."

18.     The Grant Agreement further provided that MEF "retains the right to terminate this Grant Agreement and withhold, withdraw, or demand return of the entire [$32,000] Grant in the event that [Thomas] violates any term or obligation in this Agreement."

19.     Barbounis, as MEF's agent and primary contact with Robinson, was at all relevant times aware of the terms and provisions of the Grant Agreement; that MEF had paid Thomas $32,000; that the entire sum was to be used exclusively for the purposes described in the Grant Agreement, that is, to fund the Robinson Rally; and that Thomas was not entitled to take any of the money for himself or to use it for his own benefit.

20.     In an e-mail she sent to her supervisor, Roman, on June 3, 2018, Barbounis asked Roman for permission to travel to London with an MEF co-worker, Patricia McNulty ("McNulty"), "to attend the [Robinson] rally and help out;" and Roman granted Barbounis and McNulty permission to make the trip for that purpose only.

21.     On or about June 8, 2018, Barbounis traveled to London with McNulty to supervise and attend the Robinson Rally.

22.     While in London for the Robinson Rally, Barbounis met Thomas for the first time.

23.     At the time of the Robinson Rally or shortly thereafter, Barbounis became aware of the fact that of the $32,000 that MEF had paid to Thomas pursuant to the Grant Agreement, Thomas had stolen or misappropriated a substantial portion of the money for his own personal use and benefit unrelated to the Robinson Rally ("Thomas' Theft").

24.     In breach of her trust, fiduciary, and loyalty obligations to MEF, Barbounis willfully failed to disclose to MEF her knowledge of Thomas' Theft from June 2018 until she resigned from on August 7, 2019; and Barbounis willfully concealed Thomas' Theft from MEF during that period, while assuring Thomas that she would not tell MEF about it and conspiring with Thomas to keep it a secret from MEF (the "Conspiracy").

25.      In fact, MEF did not discover Thomas' Theft, Barbounis' willful concealment thereof, or the Conspiracy, until it conducted the Post-Resignation Investigation.

26.     MEF learned when it conducted the Post-Resignation Investigation that Barbounis' deliberate concealment from MEF of Thomas' Theft, and the Conspiracy, was motivated by the fact that Barbounis had initiated and continued an extramarital affair with Thomas after the June 2018 Robinson Rally; and MEF further learned that Barbounis had returned to the U.K. and Europe on a number of occasions from July 2018 to the Spring of 2019, to pursue and carry on her adulterous relationship with Thomas ("Thomas Affair"), while MEF was paying her salary and benefits.

27.     In furtherance of the Schemes, which included her intentional concealment from MEF of her knowledge of Thomas' Theft, the Conspiracy, and the Thomas Affair, Barbounis sent a Wire Communication to her supervisor, Pipes, on December 10, 2018, in which Barbounis assured Pipes that she would not "hide things" from him; and MEF discovered in the Post-Resignation Investigation that this assurance given to Pipes was false with the intent of perpetuating the Schemes.

28.     MEF discovered in the Post-Resignation Investigation that in furtherance of the Schemes and the Conspiracy, Barbounis had sent Wire Communications to

Thomas' significant other, Kalina "Jazmine" Bishop ("Bishop'), on March 7, 2019, in which Barbounis admitted to Bishop that Thomas "stole" money from MEF and that she was "keeping it quiet from MEF."

29.     MEF further discovered in the Post-Resignation Investigation that in furtherance of the Schemes and the Conspiracy, Barbounis had sent a Wire Communication to a third party, Benjamin Baird ("Baird"), on June 10, 2019, in which she acknowledged to Baird that she "knew [Thomas] stole the [$]20,000 from Tommy [Robinson]."

30.     MEF further discovered in the Post-Resignation Investigation that in 2019, in furtherance of the Schemes and the Conspiracy, Barbounis had sent a Wire Communication to Aaron Walton ("Walton"), a third party with whom she carried on an adulterous relationship when she traveled to the U.K. between March 2019 and July 2019, in which she stated to Walton, "I just want to move on from the Danny [Thomas] stuff" and "I'm willing to forget the money so he will leave me alone."

31.     Based on the contents of Barbounis' Wire Communications, MEF does not presently know exactly how much of the $32,000 Thomas stole from MEF but regardless of the amount or extent of Thomas' Theft, under the terms and provisions of the Grant Agreement, MEF is entitled to a refund of the entire $32,000, which at all relevant times has been known to Barbounis.

32.     In furtherance of the Schemes and the Conspiracy, Barbounis deliberately concealed from MEF her knowledge of Thomas' Theft and her involvement in the Conspiracy from June of 2018 until she resigned from her employment at MEF on August 7, 2019, and thereafter.

33.     In deliberately concealing from MEF her knowledge of Thomas' Theft of MEF's funds, and in participating in the Conspiracy with Thomas to conceal same from MEF, Barbounis, as MEF's Executive Liaison and Director of Communications, used, managed and/or operated MEF as an enterprise for purposes of RICO.

34.     As a direct and proximate result of the aspect of the Schemes which involved Barbounis' willful and deliberate concealment of Thomas' Theft and her active participation in the Conspiracy, MEF has been caused to suffer an economic loss to its business of $32,000, for which Barbounis is responsible as a co-conspirator; and MEF has been and will be caused to incur substantial costs of investigation to uncover Barbounis' unlawful conduct.

**C.     Barbounis abandons her job duties for MEF pursuant a plan to work exclusively with Robinson, to enrich herself, and to pursue the Thomas Affair**

35.     Pursuant to the Schemes, while she was an employee of MEF being paid by MEF, Barbounis returned to the U.K. on a number of occasions between July 2018 and the Spring of 2019, for the purposes of working for and ingratiating herself with Robinson pursuant to a plan she had to leave MEF so that she could work exclusively with Robinson, and continuing the Thomas Affair (the "Plan"); and as alleged herein, Barbounis used, managed and/or operated MEF as a RICO enterprise to carry out the Plan.

36.     Pursuant to the Schemes, of which the Plan was an integral component, Barbounis did substantial work for Robinson - unauthorized by MEF - while she was in the U.S. and in the U.K. in 2018 and 2019, before she resigned from MEF; and she

8

continued to work with Robinson on his political agenda after she left the employment of MEF, even boasting about it in an interview she gave in October of 2020.

37.     From June of 2018, when she conceived the Plan, until August 7, 2019, and thereafter, Barbounis concealed from MEF the Plan as well as the full extent and scope of her work for Robinson and her involvement in the Thomas Affair, all the while as she abandoned her job duties for MEF as she was accepting her salary and benefits from MEF.

38.     The abandonment by Barbounis of her job duties for MEF, along with her acts of concealment, proximately and directly caused MEF to suffer substantial economic harm and injury to its business, as described below.

39.     Barbounis' abandonment of her job duties and acts of concealment were not only a deceitful part of the Schemes but were in flagrant violation of the duties of trust and loyalty that she owed to MEF.

40.     As a result of Barbounis' said acts of concealment and deceit with respect to the Plan, MEF did not discover the full extent, scope, or intent of the Plan, as it related to her work for Robinson, until it conducted the Post-Resignation Investigation.

41.     As a further result of Barbounis' said acts of concealment and deceit with respect to the Plan, MEF did not discover until it conducted the Post-Resignation Investigation that Barbounis had traveled to Europe repeatedly in 2018 and 2019, to pursue the Thomas Affair (as well as her affair with Walton).

42.     As set forth below, MEF discovered in the Post-Resignation Investigation that Barbounis drafted, conveyed, distributed and/or sent numerous Wire Communications which furthered and perpetuated the Plan.

43.     MEF discovered in the Post-Resignation Investigation that on November 6, 2018, in furtherance of the Schemes and the Plan, Barbounis had sent a Wire Communication to Thomas in which she stated her "sole mission this week [was] getting Tommy [Robinson] here [to the U.S.]."

44.     MEF further discovered in the Post-Resignation Investigation that on December 7, 2018, in furtherance of the Schemes and the Plan, Barbounis had sent a Wire Communication to her husband, Vasili Barbounis, in which she stated, "Me and [A]vi and [T]ommy [Robinson] might start our own thing."

45.     By December of 2018, Barbounis' supervisor at MEF, Pipes, had become concerned about the extent of Barbounis' unauthorized work for Robinson that followed the Robinson Rally, and as a result, Pipes sent written communications to Barbounis on December 10, 2018, in which Pipes stated, in relevant part:

> I have the sense that your position at MEF is distinctly less important than your activities with Tommy Robinson.  This is not good.

> * * * * *

> [Y]ou can see why, with what the transition and the new job functions, your taking off for such a long period to do unrelated work gives me the impression that MEF is a low priority. Especially as you did not indicate that this will be happening, nor give me a decision.  You just did it.

46.     In furtherance of the Schemes and the Plan, Barbounis responded to Pipes' December 10, 2018 written communications in a Wire Communication she sent to Pipes on December 10, 2018, in which she intended to convey to Pipes that her work with Robinson was a thing of the past, and that she had discontinued such work so that

she could now focus on her assigned job responsibilities for MEF.  As Barbounis stated in that Wire Communication to Pipes:

> I can see why you would feel that way and all I can do is apologize and do better.  The Tommy [Robinson] stuff <u>was</u> something I <u>was</u> good at.  I finally <u>felt</u> like I <u>was</u> contributing. I can see why it looks the way it does.  I guess I <u>got</u> carried away.  I <u>thought</u> I <u>was</u> doing the right thing.  Certainly [I] <u>wasn't</u> trying to neglect MEF or hide things from you.

(Emphasis added to highlight Barbounis' use of the past tense).

47.     Despite the admonition that Barbounis received from Pipes regarding MEF being "a low priority" for her, and the contents of Barbounis' December 10, 2018 Wire Communication to Pipes, MEF discovered in the Post-Resignation Investigation that pursuant to the Schemes and the Plan, Barbounis had traveled to Brussels, Belgium, on or about January 28, 2019, and had stayed there until February 5, 2019, to spend time with Thomas and to continue the Thomas Affair.

48.     In addition, in flagrant disregard of the written admonition she received from Pipes on December 10, 2018, MEF discovered in the Post-Resignation Investigation that in furtherance of the Schemes and the Plan, Barbounis had lied to and deceived Pipes in her December 10, 2018 Wire Communication about having ended her work for Robinson in that, on February 19, 2019, Barbounis had sent Wire Communications on behalf of Robinson to Joel Gehrke ("Gehrke") and Chris Tomlinson ("Tomlinson"), in which she asked Gehrke and Tomlinson if they were interested in supporting Robinson's political agenda at an event involving Robinson in the U.K. that Barbounis and Robinson were organizing and planning.

49.     MEF further discovered in the Post-Resignation Investigation that in furtherance of the Schemes and the Plan, and in further violation of Pipes' written

admonition about her activities on behalf of Robinson, as of February of 2019, Barbounis had accepted the position of Director of Communications for TR.News, an association or entity established for the purpose of promoting and publicizing Robinson and his political agenda; and that while on the payroll of MEF, Barbounis had continued to serve in that capacity for Robinson and TR. News at least until the time she resigned from her employment with MEF on August 7, 2019.

50.    MEF further discovered in the Post-Resignation Investigation that beginning in February of 2019 and continuing thereafter at least until the time she resigned from MEF, while on the payroll of MEF, Barbounis had used, managed, controlled and/or operated TR.News to carry out and facilitate the Schemes and the Plan.

51.    MEF further discovered in the Post-Resignation Investigation that on February 27, 2019, in further violation of the written admonition she received from Pipes, and in furtherance of the Schemes and the Plan, Barbounis had sent a Wire Communication to a third party, Don Seymour, with a copy to Robinson, identifying herself as Director of Communications for TR. News.

52.    MEF further discovered in the Post-Resignation Investigation that Barbounis' work for Robinson, including as Director of Communications for TR.News, had included frequent communications with Rebel Media ("Rebel"), a conservative Canadian news and investigation journalism organization founded and controlled by Ezra Levant ("Levant"), a supporter of Robinson and his political agenda.

53.    As of March 2019, Levant was interested in opening a branch of Rebel in the U.S., and he needed funding for that purpose.

54.     MEF further discovered in the Post-Resignation Investigation that in March of 2019, in furtherance of the Schemes and the Plan, and while she was on the MEF payroll, Barbounis had made an agreement with Levant that if Barbounis could find a $1 million donor for Levant to open a branch of Rebel in U.S., Levant would pay Barbounis a commission in the amount of $100,000, which Barbounis planned to conceal from MEF so that she could keep the money for herself.

55.     MEF further discovered in the Post-Resignation Investigation that in one of her trips to the U.K., Robinson had introduced Barbounis to Terry Giles ("Giles"), a wealthy businessman who Barbounis regarded as a potential donor to Levant that would result in her receiving the $100,000 commission; and that Barbounis had arranged to meet with Giles and Levant in the U.K. in March of 2019.

56.     In furtherance of this aspect of the Schemes – unbeknownst to MEF until it conducted the Post-Resignation Investigation - Barbounis sent a Wire Communication to Levant on March 15, 2019, with the subject line, "Terry Giles Proposal", which included a proposal for Giles' funding of a new branch of Rebel, which was to be the triggering event for Barbounis to be paid the $100,000 commission.

57.     In furtherance of this aspect of the Schemes – unbeknownst to MEF until it conducted the Post-Resignation Investigation - Barbounis sent a Wire Communication to Giles on March 18, 2019, with the subject line, "Tommy Robinson and The Rebel. media", in which she further pursued the $100,000 commission by mentioning the work she and Robinson were doing with Rebel in Canada, as well as Levant's interest in opening a U.S. branch of Rebel and Levant's need for funding.

58.     In furtherance of this aspect of the Schemes – unbeknownst to MEF until it conducted the Post-Resignation Investigation - Barbounis sent Wire Communications to Giles on March 18 and 19, 2019, with the subject line "Tommy Robinson and The Rebel. media," in which she proposed dates and times for a meeting with Giles, Levant and herself in the U.K. regarding the funding proposal for which Barbounis would be paid the $100,000 commission.

59.     MEF further discovered in the Post-Resignation Investigation that on March 19, 2019, Barbounis' co-worker at MEF, McNulty, had sent a Wire Communication to Barbounis, in which McNulty stated that Barbounis was "going to be amazing and knock it out of the park and walk away with a $100,000 commission and a year off."

60.     Barbounis' attempts to secure the $100,000 commission, which resulted from Robinson having introduced her to Giles, as well as her communications with Giles and Levant which included an in-person meeting she had with them and Robinson in the U.K. on or about March 22, 2019 – not discovered by MEF until it conducted the Post-Resignation - were in flagrant disregard of her obligations of trust and loyalty to MEF, and in furtherance of the Schemes.

61.     On or about April 12, 2019, MEF received negative press coverage due to Barbounis' ongoing political work for Robinson in violation of the written admonition she had received from Pipes four months before.

62.     Accordingly, on April 15, 2019, Pipes, who as the result of Barbounis' deliberate concealment, was unaware of the Scheme, the Plan, or the full extent of Barbounis' work on behalf of Robinson, sent a written communication to Barbounis in

which he stated, in part, that "[i]t seems to me that you're getting too caught up with the Europe topic at the expense of your internal MEF work."

63.     In addition, in a written communication that he sent to Barbounis on April 16, 2019, Pipes stated, "Please don't surprise me with your travels."

64.     MEF discovered in the Post-Resignation Investigation that despite the April 2019 written instructions she received from Pipes, when Barbounis had taken a trip to the U.K. in the Spring of 2019, and Pipes had confronted her at that time about the purpose of the trip, Barbounis had falsely stated to Pipes that it was a vacation with her children, when the true purpose of the trip was to carry on the Thomas Affair.

65.     On or about May 28, 2019, Pipes and MEF learned that in further violation of Pipes' directives, Barbounis – while on the payroll of MEF - had recently planned, operated, and attended three separate rallies for Robinson in the U.K. to support Robinson and his political agenda; and as a result of that discovery, Pipes sent a written communication to Barbounis on May 28, 2019, stating, in part, "from now on, you need express permission from me before engaging in MEF travel and you must also clear with me any personal travel that includes a political agenda."

66.     Barbounis was aware that her ongoing unauthorized activities on behalf of Robinson and his political agenda as well as his campaign for a seat in the European Parliament – unauthorized by MEF - jeopardized MEF's status as a 501(c)(3) organization, as MEF is subject to strict legal controls concerning its use of funds and involvement in political activities.

67.     On June 5, 2019, Pipes sent another written communication to Barbounis, in which he stated, in relevant part:

[T]he Guardian article from May 17 [, 2019] has a long, insinuating paragraph about you along with a picture of you. The clear implication is that MEF supports Tommy Robinson's campaign.

This rates as both a surprise and an unwelcomed complication. The article could entirely disappear but it could also pop up in the future and make trouble for us. I do not want potential trouble hanging over us, so [I] am displeased.

You and I have already discussed the matter of your affiliating MEF too closely with Tommy Robinson and we reached an informal agreement that you would stay away from his efforts. Given this development, I am now imposing a formal limitation on you: No campaign work, even during your private time, without clearance from me.

68.     As of June 5, 2019, when Pipes wrote to Barbounis, MEF and Pipes were unaware of Barbounis' Plan to leave MEF so that she could work exclusively for Robinson, or the full extent and scope of her ongoing unauthorized activities on behalf of Robinson, including her role and activities on behalf of TR.News.

69.     MEF discovered in the Post-Resignation Investigation that in furtherance of the Schemes and the Plan, on or about July 1, 2019, Barbounis had ignored Pipes' clear instructions by drafting and issuing a Wire Communication on behalf of Robinson, in the form of press release for Robinson that was widely distributed, which identified Barbounis as a representative of TR.News, included her contact information, and was drafted on and sent from MEF's proprietary software.

70.     MEF further discovered in the Post-Resignation Investigation that in furtherance of the Schemes and the Plan, on or about July 16, 2019, Barbounis had again disregarded Pipes' clear instructions by drafting and issuing a Wire Communication on behalf of Robinson, again utilizing MEF's proprietary software, in the

form of a press release that was widely distributed, in which Barbounis identified herself as Director of Communications for TR.News.

71.     As a direct and proximate result of the Schemes, which included the Plan, Barbounis' willful abandonment of her job duties for MEF, her ongoing unauthorized work for Robinson, her intention to enrich herself and her pursuit of the Thomas Affair, which the Schemes being carried out out over a period of at least 14 months while MEF was continuing to pay her salary and benefits, MEF has been caused to suffer substantial economic harm and injury to its business, including a loss of followers, subscribers and/or donors; Barbounis' failure to increase publications and media exposure; her failure to schedule and conduct conference calls with subscribers; her failure to generate weekly reports; and the loss of other business opportunities; and in addition, MEF has been and will be caused to incur substantial costs of investigation to uncover Barbounis' unlawful conduct.

**D.      Barbounis' theft, misappropriation, misuse, and unauthorized use of MEF confidential information and trade secrets**

72.     On or about September 25, 2017, MEF entered into a written employment agreement with Barbounis (the "Employment Agreement"), in which Barbounis agreed to accept employment with MEF.

73.     In the Employment Agreement, Barbounis agreed that, as a condition of her employment at MEF, she would be required to sign a Confidentiality & Non-Disclosure Agreement ("NDA").

74.     On September 25, 2017, Barbounis signed an acknowledgement that she had received a copy of MEF's Personnel Manual.

75.     In the acknowledgement that she signed on September 25, 2017, Barbounis agreed to abide by the terms and provisions of the MEF Personnel Manual.

76.     The MEF Personnel Manual states, in relevant part, that "[a]ll information and technology of MEF, the unauthorized disclosure of which would be detrimental to the interests of MEF ('MEF Confidential Information'), is solely the property of MEF" and that "[e]mployees must maintain all MEF Confidential Information in strict confidence and protect against its disclosure or dissemination."

77.     In accordance with the Employment Agreement, on October 16, 2017, Barbounis signed the NDA, in which she acknowledged that she would be given access to MEF Confidential Information including trade secrets during her employment with MEF.

78.     Specifically, in the NDA, Barbounis agreed to "take reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of [MEF] Confidential Information" and that she "shall take at least those measures that it takes to protect its own most highly confidential information and shall promptly notify MEF of any misuse or misappropriation of [MEF] Confidential Information of which [she] becomes aware."

79.     In the NDA, Barbounis further agreed not to "disclose any [MEF] Confidential Information to any third party" without the "prior written consent of MEF." The NDA defined "Confidential Information" to include trade secrets such as "[t]he names and/or addresses . . . utilized by donors (individuals, families and/or foundations) who provide financial or in-kind support to MEF."

80.     On or about January 8, 2019, Barbounis executed a "Bring Your Own Device Agreement" ("BYODA"), in which she agreed to have her computer ("device") password-protected at all times; to ensure that no other persons would have access to the device or any MEF data including MEF Confidential Information contained therein; to segregate any MEF data residing on the device: and to not use the device for any illegal or unlawful purpose; and the BYODA defined MEF data to include MEF "contacts" and "proprietary information".

81.     Pursuant to the BYODA, Barbounis conducted work for MEF on the device until she voluntarily resigned from her employment with MEF on August 7, 2019; and the device contained MEF Confidential Information including trade secrets to which she was given access as an employee of MEF, including but not limited to MEF's funding sources and proposals, fund raising practices, names of donors, donation amounts and proposals, media member lists, internal strategy documents, and marketing initiatives.

82.     In her positions as Executive Liaison and Director of Communications, MEF, in reliance upon Barbounis' agreements with and commitments to MEF, granted Barbounis access to MEF Confidential Information including the trade secrets alleged herein.

83.     MEF discovered in the Post-Resignation Investigation that in furtherance of the Schemes, Barbounis has repeatedly violated the Employment Agreement, the NDA, and the BYODA (collectively, "Agreements"), as well as her duty of trust and loyalty to MEF, by misappropriating and misusing, as well as conveying, transmitting, sending, distributing and/or disseminating, without the consent or authorization of MEF, MEF Confidential Information including trade secrets.

84.     In furtherance of this aspect of the Schemes ("Trade Secrets Scheme"), Barbounis has, in flagrant breach of the Agreements, conveyed, transmitted, sent, distributed and/or disseminated Wire Communications containing MEF Confidential Information including trade secrets to third parties, her personal computer, and her personal e-mail account, without the consent or authorization of MEF.

85.     Barbounis has used, managed and/or operated MEF as an enterprise for purposes of RICO to perpetuate and facilitate the Trade Secrets Scheme.

86.     The nature, extent and scope of the Trade Secrets Scheme establishes that there is a real threat that acts in furtherance of the Trade Secrets Scheme will be repeated in the future.

87.     The Wire Communications containing MEF Confidential Information including trade secrets described below – not discovered by MEF until it conducted the Post-Resignation Investigation – were conveyed, transmitted, sent, distributed and/or disseminated by Barbounis to perpetuate and facilitate the Trade Secrets Scheme.

88.     The Post-Resignation Investigation revealed that on or about September 8, 2018, Barbounis sent to her personal e-mail account, a proprietary MEF trade secret paper on funding for United Nations Relief and Works Agency for Palestine Refugees.

89.     The Post-Resignation Investigation further revealed that on or about September 17, 2018, Barbounis sent to her personal e-mail account, a sensitive MEF trade secret document on countering violent extremism, composed on MEF's letterhead.

90.     The Post-Resignation Investigation further revealed that on or about April 10, 2019, Barbounis sent to her personal e-mail account, a General Operating Support

MEF master trade secret document and e-mail listing organizations and donors that had been approached by or had sent proposals for donations to MEF.

91.     The Post-Resignation Investigation further revealed that Barbounis improperly accessed and electronically backed up on her personal computer, a confidential MEF master trade secret donor and e-mail distribution list containing more than 60,000 contacts.

92.     The Post-Resignation Investigation further revealed that the Wire Communications sent by Barbounis to Gehrke and Tomlinson on February 19, 2019, to advance and promote the political agenda of Robinson, were sent by Barbounis from MEF's proprietary licensed Meltwater account.

93.     The Post-Resignation Investigation further revealed that on or about April 10, 2019, Barbounis sent a Wire Communication from her personal e-mail to McNulty, with the subject line "Master GOS Report and Proposal", which included highly confidential MEF trade secret donor information including the dollar amounts of donations.

94.     The Post-Resignation Investigation further revealed that on or about April 10, 2019, Barbounis sent a Wire Communication from her personal e-mail account to Amy Mekelburg ("Mekelburg"), a friend of hers who is affiliated with the RAIR Foundation, an actual or potential competitor of MEF, which included an excel file with MEF trade secrets that listed the names, contact information and donation amounts of approximately 25 donors to MEF.

95.     The Post-Resignation Investigation further revealed that on or about April 11, 2019, Barbounis sent a Wire Communication to Mekelburg from her personal e-mail

account which included an internal MEF e-mail thread containing MEF trade secrets such as names of actual and prospective donors, as well as donation amounts solicited.

96.     The Post-Resignation Investigation further revealed that on or about June 18, 2019, Barbounis sent a Wire Communication to Mekelburg from her personal e-mail account which included an MEF trade secret document titled "MEF Europe", which described MEF's plans to expand into Europe.

97.     The Post-Resignation Investigation further revealed that on or about August 27, 2019, approximately 18 days after she had resigned from her employment with MEF, Barbounis sent a Wire Communication to Mekelburg from her personal e-mail account which included three excel files containing MEF trade secret "media lists" produced by another MEF employee via a third-party software program; and that Barbounis had accessed the files the day before she resigned from MEF.

98.     As a direct and proximate result of the Trade Secrets Scheme, MEF has been and will be caused to suffer substantial economic harm and injury to its business; and MEF has been and will be caused to incur substantial costs of investigation to uncover Barbounis' unlawful conduct.

99.     As a further direct and proximate result of the Trade Secrets Scheme, MEF has suffered a loss of economic value from the MEF Confidential Information including trade secrets not being generally known or readily ascertainable to third parties, including actual or prospective competitors of MEF, who have been, are and will in the future be able to obtain economic value from Barbounis' improper conveyance, transmittal, sending, distribution and/or dissemination thereof.

100.    In addition, as a further direct and proximate result of the Trades Secrets Scheme, Barbounis can and is likely to obtain value and economic gain for herself as a direct and proximate result of her continuing improper access to as well as her conveyance, transmittal, sending, distribution and/or dissemination of the MEF Confidential Information including trade secrets.

## **FIRST CAUSE**

## **18 U.S.C. §1962(c) – FEDERAL CIVIL RICO**

101.    MEF incorporates by reference all allegations set forth in ¶¶ 1 through 100, above, as if set forth fully and at length herein.

### A.    **Applicable Statutes**

102.    18 U.S.C. §1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…".

103.    The Federal RICO Statute, and specifically, 18 U.S.C. §1964(c), creates a private right of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. §] 1962," and provides that a person so injured "may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]"

### B.    **The Enterprise**

104.    MEF, as a 501(c)(3) nonprofit organization, is and at all relevant times has been a legal entity and an "enterprise" within the meaning of 18 U.S.C. §1961(4).

105.   Throughout the course of her employment at MEF from October 16, 2017 through August 7, 2019, Barbounis, as Executive Liaison and Director of Communications, along with other persons, conducted and managed the affairs of MEF, the enterprise.

106.   At all relevant times, the activities of MEF have affected interstate and foreign commerce in that MEF has provided services to clients located in states other than Pennsylvania as well as foreign countries, and it is an organization and business which provides and uses goods and services which travel in interstate and foreign commerce.

**C.      The Racketeering Violations**

107.   From June 2018 through the time her employment relationship with MEF ended on August 7, 2019 – a period of at least 14 months – Barbounis, as a person associated with and employed by the enterprise MEF, knowingly and unlawfully conducted and participated, directly and indirectly, in the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(1) and 18 U.S.C. §1961(5), all in violation of 18 U.S.C. §1962(c).

108.   Barbounis has engaged in a pattern of racketeering activity by committing at least two predicate acts of racketeering activity as of the effective date of RICO, with each such act occurring within 10 years of the previous act.

109.   The predicate acts of racketeering activity committed by Barbounis constitute wire fraud in violation of 18 U.S.C. §1343 and theft of trade secrets in violation of 18 U.S.C. §1832.

110.    The nature and extent of the predicate acts of racketeering committed by Barbounis that constitute theft of trade secrets pose a real threat of repetition in the future, particularly in the light of MEF's discovery that Barbounis conveyed, distributed and/or disseminated MEF trade secrets to a third party, Mekelburg, after Barbounis had left the employment of MEF.

**D.    First Component of Schemes – Wire Communications and Deceptive Acts Associated with Concealment of Thomas' Theft**

111.    One component of the Schemes which violated RICO includes the following pattern of Wire Communications and deceptive acts committed by Barbounis:

(a)    In an e-mail she sent to Roman on June 3, 2018, Barbounis requested permission of MEF to travel to London "to attend" the Robinson Rally and "help out;"

(b)    At all relevant times, Barbounis was aware that MEF had paid Thomas $32,000, and that the money was to be used exclusively to fund the Robinson Rally, and for no other purpose;

(c)    As of the time of the Robinson Rally, or shortly thereafter, Barbounis became aware of Thomas' Theft of a substantial portion of the $32,000;

(d)    From approximately June 2018 until she left the employment of MEF on August 7, 2019, and thereafter, Barbounis deliberately concealed her knowledge of Thomas' Theft from MEF, as a result of which MEF was unable to discover Thomas' Theft until it conducted the Post-Resignation Investigation;

(e)    While concealing Thomas' Theft from MEF, Barbounis assured Thomas that she would not tell MEF about it and she conspired with Thomas to keep it a secret from MEF;

(f)     MEF discovered in the Post-Resignation Investigation that Barbounis' deliberate concealment of Thomas' Theft was motivated by the fact that she had initiated and continued an extramarital affair with Thomas shortly after the June 2018 Robinson Rally, and had returned to the U.K. and Europe on a number of occasions between July 2018 and the Spring of 2019 to pursue and carry on the Thomas Affair, while she was on the payroll of MEF;

(g)     On December 10, 2018, Barbounis sent a Wire Communication to her supervisor at MEF, Pipes, assuring Pipes that she would not "hide things" from him; and  MEF discovered in the Post-Resignation Investigation that this statement was false and intended to mislead Pipes to believe she was honest and trustworthy, when she was continuing to conceal Thomas' Theft from MEF;

(h)     MEF discovered in the Post-Resignation Investigation that on March 7, 2019, Barbounis sent a Wire Communication to Thomas' significant other, Bishop, in which Barbounis admitted that Thomas "stole" money from MEF and that she was "keeping it quiet from MEF;"

(i)     MEF further discovered in the Post-Resignation Investigation that on June 10, 2019, Barbounis sent a Wire Communication to a third party, Baird, in which she acknowledged to Baird that she knew Thomas had stolen $20,000 of the MEF money that was to have been used for the Robinson Rally;

(j)     MEF further discovered in the Post-Resignation Investigation that notwithstanding her written assurance to Pipes that she would not "hide things" from him, she had traveled to Belgium from January 28, 2019 until February 5, 2019, to spend time

with Thomas and continue the Thomas Affair, as she was continuing to conceal Thomas'
Theft from MEF;

      (k)     MEF further discovered in the Post-Resignation Investigation that in
2019, while employed by MEF, Barbounis sent a Wire Communication to another third
party, Walton, in which she stated that she wanted to "move on" from Thomas and was
"willing to forget the money" stolen by Thomas from MEF; and

      (l)     MEF further discovered in the Post-Resignation Investigation that
notwithstanding her written assurance to Pipes that she would not "hide things" from
him, she had falsely stated to Pipes when she took a trip to the U.K. in the Spring of
2019 that she was vacationing with her children, when the true purpose of the trip was
to carry on the Thomas Affair, as she was continuing to conceal Thomas' Theft from
MEF.

    **E.**    **Second Component of Schemes – Wire Communications and
Deceptive Acts Associated with Barbounis' Abandonment of Her Job
Responsibilities for MEF Pursuant to a Plan to Work Exclusively with
Robinson, to Enrich Herself, and to Pursue the Thomas Affair**

    112.    Through a series of Wire Communications and deceptive acts described
herein, Barbounis further violated RICO by willfully abandoning her job duties for MEF
pursuant to her Plan to work exclusively for Robinson, to enrich herself, and to pursue
the Thomas Affair.

    113.    The Wire Communications and acts of deception related to this
component of the Schemes, which were in violation of RICO, have included the
following:

      (a)     From June 2018 until she resigned from MEF on August 7, 2019,
while she was on the payroll of MEF, Barbounis did substantial unauthorized work for

Robinson in the U.K. and in the U.S.; and Barbounis willfully concealed from MEF the nature, full scope and extent of the work she was doing for Robinson as well as her Plan to leave MEF to continue working for Robinson;

(b)     MEF discovered in the Post-Resignation Investigation that on November 6, 2018, Barbounis sent a Wire Communication to Thomas stating that her "sole mission" was to get Robinson to the U.S.;

(c)     MEF further discovered the Post-Resignation Investigation that on December 8, 2018, Barbounis sent a Wire Communication to her husband in which she stated that she and Robinson "might start [their] own thing;"

(d)     On December 10, 2018, Barbounis sent a Wire Communication to her supervisor at MEF, Pipes, in which she intentionally misled and deceived him to believe that she had discontinued her work for Robinson and would thereafter focus on her assigned responsibilities for MEF;

(e)     Barbounis' December 10, 2018 Wire Communication to Pipes further stated, falsely, that she would not "hide things" from Pipes, when in fact, as MEF later discovered in the Post-Resignation Investigation, she deliberately concealed from MEF and Pipes, throughout the course of her employment, the nature, full scope and extent of her unauthorized work for Robinson, as well as the Thomas Affair, all the while as she was receiving her salary and benefits from MEF;

(f)     MEF discovered in the Post-Resignation Investigation that on February 19, 2019, Barbounis sent Wire Communications on behalf of Robinson to third parties to support Robinson's political agenda as well as an event involving Robinson in the U.K. that Barbounis and Robinson were organizing and planning;

(g)     MEF further discovered in the Post-Resignation Investigation that as of February 2019, Barbounis had begun to work for Robinson as Director of Communications for TR.News, while she was still employed by MEF as its Director of Communications;

(h)     MEF further discovered in the Post-Resignation Investigation that on February 27, 2019, Barbounis sent a Wire Communication to a third party on behalf of Robinson, identifying herself as Director of Communications for TR. News;

(i)     MEF further discovered in the Post-Resignation Investigation that in March of 2019, that Barbounis made an agreement with a Robinson supporter, Levant, under which she would be paid a $100,000 commission if she could assist Levant in finding a donor for Levant to open a branch of Rebel in the U.S., and that Barbounis intended to keep the commission for herself and to conceal it from MEF;

(j)     MEF further discovered in the Post-Resignation Investigation that between March 15 and 19, 2019, Barbounis sent a series of Wire Communications to Levant and Giles (the potential donor) in connection with her plan to receive the $100,000 commission if Giles would agree to provide funding to Levant;

(k)     In the Spring of 2019, in clear violation of directives she had received from Pipes, and while she was on the MEF payroll, Barbounis planned, operated, and attended three rallies for Robinson in the U.K. to support Robinson and his political agenda;

(l)     At all relevant times, Barbounis was aware that her ongoing activities on behalf of Robinson, his political agenda, and his campaign for a seat on the

European Parliament – unauthorized by MEF – jeopardized MEF's status as a 501(c)(3) organization;

      (m)    MEF discovered in the Post-Resignation Investigation that in July of 2019, Barbounis drafted and issued Wire Communications on behalf of Robinson, in the form of press releases that were widely distributed, in which she identified herself as a representative of Robinson and TR. News and for which she used MEF's proprietary software; and

      (n)    MEF further discovered in the Post-Resignation Investigation that notwithstanding the assurance Barbounis had given to Pipes in her Wire Communication of December 10, 2018, that she would not "hide things" from Pipes, Barbounis had traveled to Europe repeatedly in 2018 and 2019 to pursue the Thomas Affair (as well as her affair with Walton), all while she was on the MEF payroll.

### F.   Third Component of Schemes – Wire Communications and Deceptive Acts Associated with Theft of Trade Secrets

114.    As described herein, Barbounis further violated RICO by misappropriating, misusing, conveying, transmitting, sending, distributing and/or disseminating, without the consent or authorization of MEF, MEF Confidential Information including trade secrets.

115.    The Wire Communications and unlawful acts of Barbounis related to this component of the Schemes have included the following:

      (a)    On or about October 16, 2017, Barbounis signed the NDA, in which she acknowledged that she would be given access to MEF Confidential Information including trade secrets during her employment with MEF;

(b)     In the NDA, Barbounis agreed, inter alia, to "take reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of [MEF] Confidential Information" and that she would not "disclose any [MEF] Confidential Information to any third party" without the "prior written consent of MEF";

(c)     The NDA defined "Confidential Information" to include trade secrets such as the names and addresses of MEF's actual and potential donors who have provided or may provide financial support to MEF;

(d)     On or about January 2019, Barbounis executed the BYODA, in which she agreed to have her computer device password-protected at all times as well as other protections which included that no other persons would have access to any MEF data contained in her device and that she would not use the device for any illegal or unlawful purpose;

(e)     Pursuant to the BYODA, Barbounis conducted her work for MEF on the device referenced therein, which contained MEF Confidential Information including trade secrets of MEF to which she was given access as an employee of MEF, including but not limited to MEF funding sources, fund raising practices, donor information, project and donor proposals, media member lists and marketing initiatives; and

(f)     As alleged above, MEF discovered in the Post-Resignation Investigation that at various times between September 8, 2018 and August 27, 2019, Barbounis repeatedly violated the NDA, the BYODA, as well as her trust and fiduciary obligations to MEF, by conveying, transmitting, sending, distributing and/or disseminating Wire Communications containing MEF Confidential Information including

trade secrets to her personal computer, her personal e-mail account, and third parties, without the knowledge, consent or authorization of MEF.

116.   These acts committed by Barbounis were in violation of RICO and 18 U.S.C. §1832(a)(1) and (2).

**G.   Pattern of Racketeering Activity**

117.   The course of conduct engaged in by Barbounis constituted the requisite "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity as defined by 18 U.S.C. §1961(5).

118.   The "relatedness" prong is established because the predicate acts committed by Barbounis have similar purposes, results, participants, or methods of commission and/or are related to the affairs of the enterprise.

119.   All predicate acts committed by Barbounis pursuant to the Schemes, as alleged above, had the purpose and effect of defrauding MEF, depriving MEF of economic value, and injuring MEF in its business or property.

120.   MEF is able to satisfy the "continuity" prong because the racketeering activity occurred repeatedly over a period of at least 14 months; and in addition, the acts and pattern of wire fraud and theft of trade secrets have involved different but related Schemes that were continuous over the 14-month period, with Wire Communications and deceptive acts occurring on a regular basis.

121.   In addition, as alleged above, the nature and extent of the theft of trade secrets component of the Schemes, including the fact that Barbounis conveyed, distributed and/or disseminated MEF Confidential Information including trade secrets to

a third party after she had resigned from her employment with MEF, establishes that there is a real threat of continuity of the activity in the future.

**H.      Injury**

122.    As a direct and proximate result of Barbounis' predicate acts of racketeering in violation of 18 U.S.C. §1962(c), MEF has been injured in its business or property as set forth more fully above.

## SECOND CAUSE

## 18 U.S.C. §1962(d) – FEDERAL CIVIL RICO CONSPIRACY

123.    MEF incorporates by reference all allegations set forth in ¶¶ 1 through 122, above, as if set forth fully and at length herein.

124.    From June of 2018 through August 7, 2019, Barbounis conspired to violate 18 U.S.C. §1962(c), in that Barbounis agreed with one or more co-conspirators to conduct or participate in the affairs of the enterprise, MEF, through a pattern of racketeering activity consisting of a series of acts alleged above that were in violation of 18 U.S.C. §1343 (wire fraud) and 18 U.S.C. §1832 (theft of trade secrets).

125.    The conspiratorial objective of the mutual agreement was to cause injury to MEF's business or property, and therefore, the conduct pursuant to the conspiracy violated 18 U.S.C. §1962(d).

126.    Barbounis, as a co-conspirator, intended to and did complete and facilitate the Schemes to defraud MEF, as alleged above.

127.    As alleged above, Barbounis has engaged in numerous predicate acts of racketeering activity in furtherance of the conspiracy, which were designed to and did defraud MEF and cause injury to MEF's property or business.

128.    The nature of Barbounis' acts, material misrepresentations, and material omissions, in furtherance of the conspiracy, gives rise to an inference that Barbounis agreed to the objective of 18 U.S.C. §1962(d) by conspiring in violation of 18 U.S.C. §1962(c), and establish that Barbounis was at all relevant times aware that the acts and omissions she committed in furtherance of the Schemes and the conspiracy have been and are part of an overall pattern of racketeering activity.

**PRAYER FOR RELIEF**

129.    MEF requests that it be granted the following relief:

(a)    Actual damages to compensate it for the injuries it has sustained to its business or property as a direct and proximate result of Barbounis' violations of RICO;

(b)    Treble damages;

(c)    Reasonable attorney's fees and costs; and

(d)    Whatever and further relief that is just and appropriate.


**Sidney L. Gold & Associates, P.C.**

/s/ Sidney L. Gold_____
Sidney L. Gold, Esquire
1835 Market Street, Suite 515
Philadelphia, PA 19103
(215) 569-1999 – Office
SGold@DiscrimLaw.net

**Sidkoff, Pincus & Green, P.C.**

/s Robert A. Davitch
Robert A. Davitch, Esq.
1101 Market Street, Suite 2700
Philadelphia, PA 19107
(215) 574-0600 – Office
(215) 574-0310 – Fax
rad@sidkoffpincusgreen.com

Attorneys for Plaintiff, The Middle East
Forum

Date:  January 22, 2021